UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALOK SARIN,                          :
                                     :          NO.: 3:08-CV-1077
          Plaintiff                  :
                                     :          (JUDGE VANASKIE)
v.                                   :          (MAGISTRATE JUDGE PRINCE)
                                     :
POOJAN, INC., D/B/A ARBY'S,           :
                                     :
          Defendant                  :
                                     :

_____

## REPORT AND RECOMMENDATION

Pursuant to an Order entered on March 5, 2010 (Doc. 41), Honorable Thomas Vanaskie referred the defendant's pending Motion for Summary Judgment to the undersigned for the purpose of preparing a Report & Recommendation.


## I. Background

Plaintiff Alok Sarin commenced this action on June 4, 2008 by filing a complaint (Doc. 1) against defendant Poojan, Inc., d/b/a Arby's. The factual and procedural background of the case follows.

Alok Sarin is a native and citizen of India. He came to the United States in early 2002 for a vacation but has been here since. His first job in the country was in 2002 with United Management Services (UMS), which also sponsored him for an H-1B visa.

As an employee of UMS, Sarin worked at the Arby's in Pittston, PA, where he was hired as an Assistant Manager. (Pl.'s Dep. 22:21–25, 23:1–15, Oct. 21, 2009.) He left that position in July 2003 because of problems with his immigration papers. (*Id.* at 25:14–23.)

After a brief stint at the Masala Grill in Princeton, New Jersey, Sarin was rehired

as an Assistant Manager at the Pittston Arby's in either November 2003 or January 2004. (Compl. ¶ 25; Def.'s Stmt. of Uncontested Facts ¶ 12) By this time, Arby's was owned by Poojan, Inc.; Sarin was hired by the operator of Poojan, Robert Popp. (Pl.'s Dep. 29:13–21; Def.'s Stmt. of Uncontested Facts ¶ 4; Pl.'s Resp. to Def.'s Stmt. of Uncontested Facts ¶ 4.)

Sometime in late 2005, Sarin told Popp that his first H-1B visa was going to expire, and asked Popp to have Poojan sponsor him for renewal of the visa. Popp, who had succeeded to ownership of Poojan, agreed. (Pl.'s Dep. 123:11–25, 124:1–14.) Sarin continued to work for Poojan at the Pittston Arby's until July 24, 2006.

### (A) Treatment of Sarin as an employee

As an employee of Poojan, Sarin alleges that he was mistreated in a variety of ways. He presented evidence that he was forced to work more holidays than other managers (Pl.'s Dep. 152:18–22); that he was reprimanded for mistakes and other managers were not (*id.* at 153:5–10); that when he was reprimanded, it was in front of "everybody," whereas when other employees were reprimanded, it was not so public (*id.* at 198:25, 199:1–4); that despite being a good manager, he never received compliments for his work, although other employees were complimented (Irvin's Dep. 20:11–25, 21:1–7, Oct. 14, 2009).

Sarin also presented evidence that he was called by racially discriminatory names at Arby's, beginning in 2004 or early 2005. (Pl.'s Dep. 133:22–25, 134:1:16.) He testified that he overheard Robert Popp, the owner and president of Arby's, and Wendy Miscavage, the general manager and Sarin's direct supervisor, referring to him as a "fucking Indian" (*id.* at 135:9–24) and a "dot head" (*id.* at 136:17–25, 137:1) on numerous occasions in 2005 and 2006 (*id.* at 138:3–14), but could not recall any time that Popp used any derogatory term in direct conversation with him (*Id.* 138:22–139:5). Other

employees offered similar testimony. (*See* Davidson's Dep. 23:23–25, 24 1:4, 56:8–22, Oct. 9, 2009 (Miscavage called Sarin "crazy Indian" but could not remember if Popp used this term); Irvin's Dep. 21:8–25, 22:1–12, 55:16–25, 56:1–25 (Popp and Miscavage called Sarin "dot head,""dumb fucking Indian," and "stupid Indian" perhaps 30 to 50 times; opining that "Wendy [Miscavage] was the instigator", and indicating that Popp referred to Sarin as "dumb fucking Indian" about 10 times).) Shawn Irvin testified that he heard Miscavage use the term "sand nigger" about five times during his employment, but could not recall Popp using this term. (*Id.* 22–24.) Sarin also described being referred to as a terrorist, a drug dealer, and a dirty Indian by Wendy Miscavage, in both conversations with him and others. (Pl.'s Dep. 139:18–25, 140:1–3, 141:4–20, 144:2–6.)

### *(B) Sarin's performance as an employee*

Robert Popp and Wendy Miscavage considered Sarin to be an all-around good employee, with an overall rating of 86.6 on his 2006–2007 performance evaluation. (Pl.'s Counter Stmt. of Material Facts ¶ 39; Popp's Dep. 217:14–16.) Among a series of numerical scores on specific performance areas, Sarin received a 90 for job knowledge, an 88 for his judgment, an 89 for his interpersonal relationship skills, an 80 for his communication skills, a 95 for his adherence to policy and procedures, and a 75 for the future-oriented category of "performance expectation" regarding "sales, labor, [and] food cost." (Popp's Dep. 208–11.) Among Sarin's major strengths were his ability to properly handle any sales volume and his dedication. (*Id.* 217:25, 218:1.) He also received high marks for independence, creativity, initiative, and adherence to policy. (*Id.* 220:8–15.)

The 2006–2007 evaluation was dated July 17, 2006, and was discussed with him the same day. (*Id.* 218:4–5.) Popp decided that based on Sarin's performance, Sarin deserved a raise from $640 weekly to $700, a raise of almost ten percent. (*Id.* 255:11–22.) This increase in salary had an effective date of July 24, one week after the performance

3

evaluation was completed. (*Id.* 255:11–13.)

Sarin received these generally strong reviews and the raise from $640 to $700 weekly despite having a documented history of strained relationships with his subordinates. A series of five customer complaints, dated February 27, 2004 to August 2005, describe issues that customers had with a manager meeting Sarin's description. (*See* Def.'s Exh. C at 14–26, Doc. 31-6.) Handwritten but undated comments from Robert Popp describe follow-up with Sarin. From a complaint in June 2004: "Spoke to Alok [Sarin] . . . [r]eminded him to calm down & not yell when excited." (*Id.* at 21.) From a complaint in October 2004: "Spoke with Alok, again reviewed with him, his temper and yelling." (*Id.* at 24.) And from October 2005: "Once again, reviewed with Alok not to yell & scream at employees when they are busy. Needs to handle in more professional manner." (*Id.* at 26.)

In the 2005–2006 evaluation of Sarin that Wendy Miscavage completed, she noted to him: "When you get excited, you tend to yell at employees, calm down." (Popp's Dep. 201:8–9.) Further: "Communication with crew is poor to good. Communication with superiors is poor to good." (*Id.* at 202:13–17.) In the 2006–2007 evaluation, Miscavage urged Sarin to "stop giving negative responses to crew." (*Id.* at 208:24–25, 209:1.) In the section for comments on areas needing improving, Miscavage included "attitude with crew." (*Id.* at 212:21–22.) For the section on interpersonal relationships, Sarin was urged to "[c]alm down" and "not yell at or threaten employees when delegating." (*Id.* at 215:4–7.) In a self-evaluation completed on July 17, 2006, the same day as his 2006–2007 evaluation was discussed with him, Sarin listed "not to loose (sic) my temper" as the sole item in "areas needing improvement." (Def.'s Exh. A, pt. 2, at 31.)

*(C) Incident with Meghan Colburn*

On July 11, 2006, an incident occurred between Sarin and a minor subordinate employee, Meghan Colburn, about which Popp and Miscavage did not fully learn until sometime after completing Sarin's 2006–2007 evaluation. (Popp's Dep. 150:17–20, 161:13–25, 162:1–13). On the night of the 11th, Colburn was on shift working the drive-through window while Sarin was managing. (Colburn's Dep. 19:5–7, 16:12–17, Dec. 9, 2009; Def.'s Stmt. of Uncontested Facts ¶ 24; Pl.'s Resp. to Def.'s Stmt. of Material Facts ¶ 24.) Colburn made a mistake with the credit card machine, and Sarin got "very, very, very mad" and yelled at her, calling her a fucking idiot. (Colburn's Dep. 17:5–6; *id.* 17:7–16, 31:2–8.) According to Colburn, Sarin "kind of lost control," although he had never cursed at her before. (*Id.* 18:5–6; 21:12–17.) Colburn estimated that during the altercation, Sarin was close enough to her that she could have reached out and touched him if she had to. (*Id.* 31:12–25.) She testified that for the rest of the night, he "held a grudge" against her for the mistake she made, as though he were unwilling to talk to her, but he did not curse at her again. (*Id.* 18:7–15; 33:25, 34:1–12.)

After Sarin received his performance evaluation on July 17, which again did not reflect the incident with Colburn on the 11th, Sarin departed for a vacation, and did not return to work until July 24. (Sarin's Dep. 216:7; Pl.'s Counter Stmt. of Material Facts ¶ 23.) After the 17th but before the 24th, the Colburn incident came to the attention of management at Arby's. (*See* Def.'s Stmt. of Uncontested Facts ¶ 25; Pl.'s Resp. to Def.'s Stmt of Material Facts ¶ 25.) According to Wendy Miscavage, the first that she had heard of the incident was on July 14, when Lori Shoop, an assistant manager at Arby's, mentioned that Rita Slater, another employee at Arby's, told Shoop about "an incident that happened."[1] (Miscavage's Dep. 97:14–23, Oct. 30, 2009; Shoop's Dep. 22:5–17,

---

[1] Miscavage evinced some uncertainty about the dates of her conversations with Shoop and the other employees. (*See* Miscavage's Dep. 113:2–3, Oct. 30, 2009 ("I don't

Nov. 30, 2009.) When Slater came in "a few days later" to pick up a check, she told Miscavage that she could no longer work at Arby's because "Alok was cursing at poor Meghan." (Miscavage's Dep. 98:1–14; Slater's Dep. 9:21–25, 10:1–13, Nov. 19, 2009.) Miscavage completed her investigation by speaking to Meghan Colburn about what happened. (Miscavage's Dep. 98:15–20.)

Miscavage reported her findings to Popp sometime between July 18 and 23. (Popp's Dep. 81:9–14; *id.* at 150:13–19.) After considering Miscavage's report and statements from Colburn, Shoop, and Bryan Anderson, another employee who was on shift at the time of the incident with Colburn, Popp decided that he was "either going to suspend Alok [Sarin] or fire him, depending on how the conversation went when he came into work on the 24th." (*Id.* at 81:9–21; 82:13–16.))


*(D) Sarin's termination*

When Sarin came back to work, Popp, with Miscavage present, led Sarin outside for a private conversation. (*Id.* 82:16–18.) Popp described the questions that he asked:

> They were general questions, like I asked him, if somebody had made a complaint against them, how would he treat them in the future? His response was: that it was a lie, everybody's after me.
>
> I asked him about, if he was suspended for a week and when he came back, how would he treat the person again? He said: He would treat them the same as he always did.

(*Id.* 82:25, 83:1–8.) Popp testified that based on that discussion, and his conclusion that Sarin "would still bother Meghan [Colburn] and make it hostile for her to work" if he kept Sarin, he decided to terminate Sarin. (*Id.* 82:20–23, 83:9–11.) Later in his deposition,

---

know precise timing or dates."); *id.* at 111:21–25, 112:1–10 (quoting a statement from Robert Popp that named July 21, 2006 as the date on which Rita Slater filed a complaint with Lori Shoop about the Colburn incident.)

Popp confirmed the basis for terminating Sarin: "My decision to fire him was based solely on the Meghan incident and his history." (*Id.* 118:2–5, Oct. 7, 2009.)[2]

Sarin's recollection of the conversation leading to his termination differs somewhat:

> Q. What was said during that conversation? Tell me what happened.
>
> A. They [Popp and Miscavage] said, Read this [selection of policy sheets]. I read that probably in 30 seconds they said, Do you understand that? I said, Yes, I understand that. Bob asked me, How did you react to this employee? I said that I would react to her the same way, the way she should be treated professionally. I think he said he was not satisfied with the answer, something like that. I don't know the exact words that were said at the time.

(Sarin's Dep. 222:8–19.)

Three days after Sarin was terminated, John Canterino, a part-time, back-line employee at Arby's, was promoted to assistant manager and given a salary of $640 per week. (*Id.* at 264:9–13; Sarin's Dep. at 206:19–25, 207:1–9.) At the time of Canterino's promotion, he was dating Miscavage and living with her. (Miscavages's Dep. 184:18–22.) Popp testified that Canterino was promoted to replace Shawn Irvin, an

---

[2] In his brief supporting opposition to summary judgment, the plaintiff discusses what he describes as Popp's inconsistent reasons for his termination. (Pl.'s Brief in Opp. to Def.'s Mot. for Summ. J. at 4–5.) Both this brief and deposition testimony from Popp elicited by the plaintiff make reference to a verified statement of Robert Popp dated August 16, 2006 and marked Bates No. 448. (Popp's Dep. 138–141; Pl.'s Brief in Opp. to Def.'s Mot. for Summ. J. at 5.) The Court regrets its inability to find this document anywhere in the docket. The Court similarly regrets its inability to find Popp's answer to the Plaintiff's administrative complaint anywhere in the docket, despite its being discussed in the plaintiff's brief and during Popp's deposition as Bates No. 61 to 69. (Popp's Dep. 90–113; Pl.'s Brief in Opp. to Def's Mot. for Summ. J. at 4–5.) The lack of these documents makes it difficult for the Court to evaluate the merit of the plaintiff's argument on this important point.

assistant manager who had left Arby's a month prior, and that Sarin's position was not filled for about a month and a half after his termination. (Popp's Dep. 221:15–23; *see also* Def.'s Exh. M, pt. 3 (Doc 31-18), at 20–23 (listing "Shawn," for Shawn Irvin, on the time sheet for the week of June 22, 2006, with his last recorded hours worked on June 25, but omitting him from the time sheet completely for the week of June 29 and in weeks following).)

*(E) Procedural History*

On August 9, 2006, Sarin filed a complaint with the Pennsylvania Human Relations Commission (PHRC), alleging harassment, discrimination, and wrongful discharge on the basis of national origin. (Doc. 31-3.)  In January 2007, the PHRC made a finding of probable cause (Doc. 14-3), and in September 2007, issued a right-to-sue letter to Sarin.

The complaint that Sarin filed in federal court originally contained four counts: Count I under Title VII claiming discrimination based on national origin; Count II under the Pennsylvania Human Relations Act, also claiming discrimination based on nation origin; Count III for common-law fraud;and Count IV for unjust enrichment. Upon motion by the defendant, this Court dismissed Counts III and IV of the complaint on December 22, 2008 (Docs. 6, 19).

On January 24, 2010, defendant Poojan, Inc. moved for summary judgment on the two remaining counts alleging racial discrimination (Doc. 30). For the reasons that follow, it is recommended that the defendant's Motion for Summary Judgment be granted in part and dismissed in part.

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must

do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## III. Discussion

The plaintiff has two surviving claims: one under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and one under the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951 *et seq*. Since the standards of the PHRA and Title VII are generally the same, and there is no reason here to diverge from this general rule, the Title VII and PHRA claims will stand or fall together. *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542 (3d Cir. 1996). In this case, the plaintiff has presented evidence in support of two routes to recovery under Title VII: first, that the defendant subjected the plaintiff to disparate treatment; second, that the defendant created a hostile work environment for the plaintiff. The defendant also presents, as an affirmative defense, an argument that the plaintiff failed to exhaust his administrative remedies. They are addressed each in turn.

### (A) Administrative exhaustion

Exhaustion of administrative remedies is a prerequisite to filing a Title VII claim in federal district court. *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 885 (3d Cir. 1977) (citing, *e.g.*, *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 246 n.8 (3d Cir. 1975); *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1092–93 (6th Cir. 1974)). There is

no dispute in this case that the plaintiff has received a right-to-sue letter from the PHRC, and thus had the right to sue in federal court. *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470–71 (3d Cir. 2001) (citing *Angelino v. N.Y. Times Co.*, 200 F.3d 73, 87 (3d Cir. 1999)). The issue is whether the plaintiff's wage-discrimination claim based upon the defendant's failure to pay "the prevailing wages or benefits as outlined in the non-immigrant worker visa application" is barred because it was not included in the PHRC charge.

It is clear from reviewing the PHRC charge that no mention was made of the matter of wages or benefits. The matter of racial discrimination—name-calling and preferential treatment in scheduling—was the sole subject of the charge. Because the matter of wages and benefits was omitted from the original charge, the plaintiff may not assert the claim now.

Whether a plaintiff is required to exhaust his or her administrative remedies turns on whether the acts alleged in the Title VII suit are "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) (citing, e.g., *Hicks v. ABT Assocs.*, 572 F.2d 960, 966 (3d Cir. 1978); *Ostapowicz v. Johnson*, 541 F.2d 394, 399 (3d Cir. 1976)). A brief review of relevant case law is instructive in defining the limits of what is "fairly within the scope" of a particular PHRC complaint.

In *Waiters*, the plaintiff filed an informal EEOC complaint against her employer, the defendant. *Id.* at 234. About a year later, the plaintiff filed a formal EEOC complaint alleging retaliation for the filing of her informal complaint. *Id.* at 235. Four months after that, the plaintiff was discharged; she filed suit in federal court alleging that the discharge was in retaliation for the formal complaint she filed. *Id.* at 236. The district court had dismissed her complaint on the grounds that the plaintiff had failed to exhaust her administrative remedies regarding the discharge. *Id.* at 234. The Third Circuit reversed,

noting that although the formal complaint alleged only retaliation, not retaliatory discharge, the "core grievance" of retaliation was the same, and that the plaintiff's allegations in federal court were within the scope of the EEOC's investigation of the formal EEOC complaint. *Id.* at 238.

The Third Circuit has held that "the parameters of the civil action . . . are defined by the scope of the EEOC investigation [that] can reasonably be expected to grow out of the charge of discrimination, including new acts" that occurred while the EEOC proceedings were pending. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976) (internal citations omitted) (citing, e.g., *Gamble v. Birmingham S. R.R. Co.*, 514 F.2d 678 (5th Cir. 1975); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970)). In *Ostapowicz,* the original EEOC charge filed by the employees' union in 1968 alleged discrimination against female members of the defendant company's bargaining unit. *Id.* at 397. Some eighteen months later, the plaintiff filed two further charges of sex-discrimination not in the bargaining unit but in the machine-shop division, where the plaintiff herself worked. *Id.* at 397, 399. Three years later, after the EEOC's settlement efforts had failed, the plaintiff requested a right-to-sue letter from the EEOC, referring to the original 1968 charge, but also mentioning the two subsequently filed charges. *Id.* at 397. The Third Circuit held that the plaintiff could bring her claims in federal court despite (1) the basis for the right-to-sue letter being the charge of discrimination in the bargaining unit and (2) the plaintiff's particular claims regarded her employment in the machine-shop division, the specifics of which were alleged in the two still-pending charges. *Id.* at 399. The court stated that the "additional charges . . . may fairly be considered explanations of the original charge and growing out of it." *Id.*

In a relatively recent case applying the *Waiters* rule, the plaintiff had applied for one of two available positions at the Department of Defense, but was rejected in favor of two female candidates. *Anton v. Perry*, 82 F.3d 1291, 1294 (3d Cir. 1996). A disabled

veteran, the plaintiff filed a formal complaint alleging disability discrimination, which was eventually appealed to the EEOC. *Id.* The EEOC found no discrimination; the plaintiff sued in federal court, alleging both disability discrimination and gender discrimination *Id.* at 1294, 1293. On appeal, the Third Circuit affirmed summary judgment on the gender-discrimination claim, holding that the plaintiff failed to exhaust his administrative remedies. *Id.* at 1295. As the court noted, gender discrimination was never alleged in the formal EEOC complaint, nor was it part of the investigation, and so a claim for gender discrimination was outside the scope of the original complaint. *Id.* at 1296.

Unlike in *Waiters*, in which the plaintiff's suit was based on acts of the defendant that followed the filling of the original EEOC charge, the wage-discrimination claim that the plaintiff seeks to bring in federal court is based on acts already known and ongoing at the time that the PHRC charge was filed. Unlike in *Ostapowicz*, in which the plaintiff had filed a series of charges with the EEOC, there was only the one charge filed with the PHRC; there were no follow-up charges and no continuing investigation based on new developments in the plaintiff's case. Further, there could have been no reasonable expectation that an investigation into name-calling and preferential scheduling would branch out into wages and benefits. And as in *Anton*, where the gender-discrimination claim was never alleged or investigated, here there was never any allegation of wage discrimination, and the PHRC's findings of probable cause show that the investigation focused only on racial epithets and preferential treatment in scheduling.

Although the plaintiff in this case is correct to point out that "the jurisdictional requirements for bringing suit under Title VII should be liberally construed," *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 887–88 (3d Cir. 1977) (citing *Canavan v. Beneficial Fin. Corp.*, 553 F.2d 860 (3d Cir. 1977)), liberal construction does not amount to a waiver of procedural requirements. The *Glus* court recognized that there are two purposes served by

13

requiring plaintiffs to seek relief from the EEOC first: "to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation." *Id.* at 888. In the case at bar, the plaintiff's PHRC complaint neither gave notice to the defendant that it may be facing federal wage-discrimination charges nor provided any impetus for resolution of the matter outside of litigation. In both respects, the wage-discrimination claim was outside the scope of the racial-discrimination claim. Accordingly, the plaintiff should have exhausted his administrative remedies for the wage-discrimination claim. Having failed to do so, he cannot raise the matter in federal court for the first time.

### *(B) Title VII disparate treatment*

### (1) Prima facie case

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has articulated a burden-shifting scheme for claims of disparate treatment, which is applied in the Third Circuit.

The plaintiff must first establish a prima facie case of discrimination by presenting evidence sufficient to satisfy four elements by a preponderance: (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff was subject to an adverse employment action despite being qualified; and (4) the adverse employment action was under circumstances raising an inference of discriminatory action, while the employer continued to seek persons with similar qualifications for the position. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). The burden of production to make this showing is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The prima facie case is meant to be flexible and tailored to the specific context of each case. *Id.* at 253 n.6 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff establishes a prima facie case, a presumption of discriminatory action arises; it is presumed that, without further explanation from the defendant, the adverse employment action was "more likely than not based on the consideration of impermissible factors." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)).

In this case, as in most, there is no dispute that the plaintiff can satisfy the first three elements of the prima facie case. The plaintiff is a member of a protected class by virtue of his Indian national origin. He was well qualified for the position, having been schooled in India, with relevant prior experience and generally positive performance evaluations at Arby's. He was terminated from his job despite being qualified.

The only possibility of a real dispute concerns whether the plaintiff was terminated under circumstances raising an inference of discriminatory action. In *Burdine*, a gender-based discrimination case, the plaintiff showed that she was a qualified woman who applied for an available position, but the position remained open for several months before she was rejected in favor of a male applicant. *Burdine*, 450 U.S. at 253 n.6. The Court found that this adverse employment action raised an inference of discrimination. *See id.* (observing that it was "not seriously contested" that the plaintiff had proven a prima facie case).

Viewing the evidence in this case in a light most favorable to the nonmoving party, the plaintiff's experience in this case is analogous to that of the plaintiff in *Burdine*. Here,

the plaintiff was a qualified employee of the defendant, but the plaintiff was nonetheless terminated. Three days after the plaintiff was terminated, John Canterino, a part-time, back-line employee at Arby's, was promoted to assistant manager, with a weekly salary of $640. Without any further explanation from the defendant, the circumstances of the plaintiff's termination suggest impermissible discrimination; here, the plaintiff has successfully established a prima facie case.

### (2) Defendant's rebuttal of the prima facie case

Once the plaintiff has made out a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The defendant must "clearly set forth, through the introduction of admissible evidence, reasons for its action which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 799 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 507) (internal quotation marks omitted). If the defendant meets this burden, the presumption of discrimination is rebutted. *Id.* at 797 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

Defendant Poojan has offered evidence that plaintiff Sarin was terminated because of an incident that occurred with a minor employee, Meghan Colburn, during which the plaintiff yelled and swore at her. When Robert Popp, the owner of the Arby's franchise that Poojan operates, confronted Sarin about the incident, he did so with the intention of either terminating or suspending Sarin, depending on how the conversation went. In his deposition testimony, Popp explained the questions he asked Sarin and the answers he received. Popp asked Sarin what he would do if he received a complaint; Sarin responded

16

that he would call it a lie. Popp also asked how Sarin would behave toward the person who complained after a week's suspension, and Sarin responded that he would behave the same. According to Popp, his decision to terminate Sarin came as a result of the incident with Colburn, the follow-up conversation, and Sarin's history of a negative attitude toward his subordinates.

In addition to Popp's testimony, Poojan supports its proffered reason for Sarin's termination with testimony and statements[3] from several other employees. Bryan Anderson, a minor employee subordinate to Sarin, submitted a statement about the verbal abuse he received from Sarin. Anderson Dep. Exh. 1. Anderson testified that on his first day of work, Sarin asked him if he could read, called him stupid, dumb, slow, and a "fuckin' moron," and screamed at him. Anderson's Dep. 18:25, 19:1–6, 27:15–23, 34:14–17, 36:2–10, 55:16–25, 56:1–6. Oct. 28, 2009. He testified that through the course of his employment, Sarin called him stupid somewhere between two and ten times. *Id.* at 25:8–24. He described Sarin as screaming at work, sometimes at people, sometimes just because "things just weren't going right." *Id.* 63:12–14. Rita Slater, an employee who worked at Arby's for four days, including the night of the incident between Sarin and Meghan Colburn, submitted a statement about the incident and testified to the "foul language" that Sarin used. Slater's Dep. 10:1–13, Nov. 19, 2009; *see* Slater Dep. Exh. 2 (containing Slater's written statement of July 25, 2006). Meghan Colburn submitted a statement and testified about the incident with Sarin, relating the language that Sarin used and describing him as "always the type of person that would get so angry easily." Colburn's Dep. 20:22–23, Dec. 9, 2009; *see* Colburn Dep. Exh. 1 (containing Colburn's undated written statement). Lori Shoop, an assistant manager at Arby's, testified that

---

[3]The four statements discussed in this paragraph were gathered by the management at Arby's during the investigation of the Colburn incident.

Sarin gave a "rough time" to three teenage workers. Shoop's Dep. 16:7–22, 18:17–24, Nov. 30, 2009.

The defendant has adequately articulated a legitimate, nondiscriminatory reason for the plaintiff's termination. In Poojan's policy information, item number six states that "[d]isrespect of Restaurant management, co-workers, or guests of Arby's will not be tolerated" and that such behavior "will lead to disciplinary actions." Sarin Dep. Exh. 52. A reasonable fact-finder could believe that Poojan terminated Sarin on the basis of violation of this policy, as seen in the incident with Colburn and as described through the statements and testimony of other Arby's employees. Further, Sarin admitted that he had seen Poojan's policy information in the Arby's office, that he had probably read it, and that he was familiar with general restaurant princples, such as policies against disrespecting coworkers. Sarin's Dep. 47:10–25, 48:1, 22–25, 49:1–3, Oct. 21, 2009.

### (3) The plaintiff's impeachment of the defendant's proffered reason

If the defendant successfully rebuts the presumption of discrimination, the burden of production then shifts back to the plaintiff, who must produce evidence sufficient to allow a reasonable fact-finder to conclude that the proffered reasons for the adverse employment action were a pretext for illegal discrimination or retaliation. *Id.* at 799. The plaintiff may meet this burden, and defeat a motion for summary judgment, with evidence "that would allow a fact finder reasonably to '(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action.'" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799–800 (3d Cir. 2003) (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999)).

The plaintiff may make this showing in either of two ways. First, the plaintiff may show that the defendant's proffered reasons "are weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.'" *Id.* at 800 (quoting *Keller v. Orix Credit Alliance, Inc.*, 2130 F.3d 1101, 1108–09 (3d Cir. 1997)); *accord Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Second, the plaintiff may provide "evidence that 'the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it could not have been the employer's real reason." *Id.* (quoting *Jones*, 198 F.3d at 413).

In this case, the plaintiff's argument focuses on bringing out the inconsistencies in the defendant's proffered justification for terminating the plaintiff. The effort to meet the "difficult burden" of demonstrating pretext, *Fuentes*, 32 F.3d at 765, consists exclusively of listing four different reasons that Popp gave for termination and leaving it to the fact-finder to conclude that, as a result, the defendant's justification is so full of contradictions as to be "unworthy of credence," *id.* (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

The plaintiff misses the mark with this argument. First, the proffered reasons are more consistent than the plaintiff claims. According to the plaintiff, the four given reasons for termination were: (1) verbally abusing minor employees; (2) threatening employees; (3) calling a minor employee "stupid" and assigning them "job after job"; and (4) a history of "yelling and screaming." Reasons (1) and (4) are entirely consistent; yelling and screaming are forms of verbal abuse. The justification of verbal abuse is also consistent with calling a minor employee "stupid," as listed in (3). Thus the inconsistencies reduce, and what is left are three reasons merely different, not contradictory: (1) verbal abuse; (2) threatening employees; and (3) assigning employees "job after job." These three reasons are not so "riddled with contradiction" that a reasonable fact-finder could find them unworthy of credence. *See* Pl.'s Br. in Opp. to

Def.'s Mot. for Summ. J. at 6 (citing case law). Quite the opposite: these are three consistent, legitimate reasons, describing behavior that a single employee could demonstrate, each of which may provide adequate grounds for termination. Contradictory reasons for termination would allege behaviors that could not all possibly be true, such as (1) failing to delegate enough work and (2) assigning "job after job." There is simply no such contradiction here.

Second, if, as here, the defendant's proffered legitimate reasons cannot be discredited as inconsistent, it falls to the plaintiff to produce evidence sufficient to allow a fact-finder "reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764. Making all reasonable inferences in favor of the plaintiff, some, but not all, of the defendant's proffered reasons could be discredited. Most notably, one justification that would survive the plaintiff's attempted impeachment is one to which plaintiff admitted: that "Popp terminated Sarin because after investigation by Wendy Miscavage, Popp determined that Sarin was verbally abusing minor employees, i.e., yelling at them, screaming at them, calling them names and because Sarin had a history of yelling and screaming at people." *See* Def.'s Stmt. of Uncontested Facts ¶ 26 (listing this justification); Pl.'s Resp. to Def.'s Stmt. of Material Facts ¶ 26 (admitting to the defendant's ¶ 26). Here, the plaintiff admitted to having an altercation with Meghan Colburn, a minor employee, and to calling her stupid. Rita Slater, a witness to the altercation, testified to what happened. The plaintiff's performance evaluation, completed by Popp and Miscavage and discussed with the plaintiff on July 17, 2006, indicated that Sarin had been urged to "[c]alm down" and "not yell at or threaten employees when delegating"—a performance review completed before Popp and Miscavage knew of the incident with Colburn. The plaintiff's own self-evaluation, also dated July 17, 2006, indicated an awareness of his need to control his temper.

Swirling unnoticed by the plaintiff through all of his argument that his termination was an act of discrimination based on national origin are two unassailable actions taken by the defendant on behalf of the plaintiff: (1) defendant sponsored plaintiff for renewal of his H-1B visa, and (2) the defendant increased the plaintiff's salary by almost ten percent shortly before the termination.

Because the plaintiff cannot successfully discredit the defendant's proffered legitimate reasons for termination, the plaintiff's claim under Title VII alleging disparate treatment must be dismissed.


*(C) Title VII hostile work environment*

A hostile work environment has been well established as a basis for a discrimination claim under Title VII. In order to establish a hostile-work-environment claim, the plaintiff must show that "(1) he suffered intentional discrimination because of his national origin; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001).

Establishing whether there is a hostile work environment is often a complex inquiry, as "any analysis is filled with pitfalls and ambiguities. . . . [A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Id.* at 261 (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999)) (internal quotation marks omitted). However, "offhanded comments" and "isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile-work-environment claim; rather, the "conduct must be extreme enough to amount to a change in the terms

and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Carrero v. N.Y. City Housing Auth.*, 890 F.2d 569, 577–78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749–50 (8th Cir. 1986).

Turning to our analysis, the first question is whether the plaintiff suffered intentional discrimination because of his national origin. There is ample evidence in the record that he has. Among the various epithets that the record reveals have been directed toward the plaintiff are "fucking Indian," "dot head," "terrorist," "Indian drug dealer," "stupid," "dirty Indian," "crazy Indian," and "sand nigger." Miscavage, the general manager, called the plaintiff a freak and asked him if he were selling drugs. She would refer to the plaintiff as a "dirty Indian" who should "go back to where he belongs." The plaintiff testified that in 2005, he overheard Popp referring to him as "that fucking Indian" who "thinks he is smarter than everybody." In another incident, after the plaintiff terminated Miscavage's son Ryan, Miscavage told another manager: "Tell that mother fuckin' Indian that my dad will kick his ass," repeating this comment two or three times. Further, the record contains testimony from the plaintiff and from Joseph Davidson, an employee at Arby's, that Popp exhibited favoritism toward Miscavage over the plaintiff. There can be no doubt that the plaintiff has proffered sufficient evidence from which a reasonable jury could believe that he suffered intentional discrimination because of his national origin.

The next question is whether the discrimination was pervasive and regular. Relevant factors in analyzing the circumstances of employment may include "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Previously, it had been held incumbent upon the plaintiff to establish "the existence of a

hostile or abusive *environment* which is severe enough to affect the psychological stability of a minority employee," *id.* (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)), but the Supreme Court has held that as long as the work environment "would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious," *Harris*, 510 U.S. at 371 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

Viewed in a light most favorable to the plaintiff, the record reveals evidence of the the following instances of discriminatory conduct toward the plaintiff, first from the plaintiff's own testimony: (1) that he was told by other employees in 2004 that he was being talked about; (2) that in 2005, he heard Popp say "fucking Indian" and "he thinks he is smarter than everybody" during a conversation with Miscavage; (3) that there were a "couple" of instances of the use of the term "dot head" in conversations between Popp and Miscavage, sometime in 2005; (4) that there were "numerous occasions" on which the plaintiff heard the term "dot head" used by Popp or Miscavage in 2005 and 2006; (5) that Danielle Miscavage, the sister of Wendy Miscavage, was present during a conversation in which the plaintiff was referred to as a "fucking Indian"; (6) that there were exchanges between Popp and Miscavage on which the plaintiff was called a terrorist, an Indian drug dealer, or a stupid, dirty Indian; (7) that Miscavage called the plaintiff a terrorist to his face, asked him if he was selling drugs, and called him a freak or stupid; (8) that in a phone call from Miscavage to Shawn Irvin, Miscavage said "tell that mother fuckin' Indian that my dad will kick his ass" two or three times; (9) that he was told by crew members of conversations with Popp during which Popp would say Sarin's name and call him a stupid Indian; (10) that Miscavage said that the plaintiff is a "dirty Indian" who should "go back to where he belongs." From Shawn Irvin's testimony: (11) that he heard Miscavage call the plaintiff "dot head," "dumb fucking Indian," and "stupid" from 30 to 50 times; (12) that Popp called the plaintiff these names about ten

times; (13) that Miscavage called the plaintiff a "sand nigger" and "crazy Indian" about five times; (14) that he heard Miscavage call Sarin a "stupid Indian" to his face. From Amanda Ambrose's testimony: (15) that she heard the plaintiff being called "crazy Indian" about three times. From Joseph Davidson's testimony: (16) that he heard Popp and Miscavage call the plaintiff "that crazy Indian" or say that they did not like him about ten to fifteen times; (17) that he once heard Ryan Miscavage say something like "fucking Indian" during an argument with the plaintiff. Tallying all of the foregoing gives a total of around 100 to 120 instances of derogatory name-calling in the period from late 2004 or early 2005 until the plaintiff's termination at the end of July 2006. The plaintiff also avers that he was constantly undermined by Popp and that he was the only one reprimanded when he made an error while working, although there is no evidence of the frequency of this sort of conduct.

The plaintiff has made an evidentiary showing of the discrimination against him that is sufficient enough for a reasonable jury to conclude that he was subject to racially discriminatory derision and that it was pervasive and regular. Such a jury could conclude that the plaintiff was put through more than mere offhand comments and isolated instances, more than mere jokes and taunting. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (offhanded comments and isolated instances alone do not support a Title VII claim); *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)) (epithets, jokes, and taunts alone do not support a Title VII claim). He was inflicted by a recurrent and frequent stream of insults, some of which threatened physical violence. Not only did Wendy Miscavage threaten to have her father "kick his ass," but she also commented that the plaintiff is a "dirty Indian" who should "go back where he belongs"—a tacit threat to the plaintiff's very ability to stay in this country. After reviewing all of the evidence that the plaintiff has presented on this point, it can be reasonably concluded that the conduct to

which he was subjected was so extreme as to "amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.

The third question is whether the plaintiff was detrimentally affected by the discrimination. In addition to his conduct that led to his termination on July 24, 2006, the plaintiff testified in his deposition as follows:

> Q. Now, you are claiming emotional distress, that emotional distress has resulted from the harrassment.
>
> . . . .
>
> A. I felt very insecure. I was not confident about moving on in life and looking for another job. I had sleepless nights because of that job.
>
> Q. When did all of that start?
>
> A. In 2005. It was just building up, building up and then I started drinking a lot, going to bars pretty much every day. I was just fed up.
>
> . . . .
>
> Q. Did you suffer any other damages as a result of what you are claiming occurred in this case?
>
> . . . .
>
> A. I kind of kept myself away from people, isolated myself.
>
> Q. When was that?
>
> A. During 2006, early 2006.
>
> Q. You isolated yourself from people?
>
> A. I'll still go to work and everything, but my personal life was effected [sic] by it. I didn't socialize with a lot of people; what I was doing before I wasn't doing it to that extent. I would rather sit in a bar myself and drink.

Pl.'s Dep. 202:6–23, 205:2–21, Oct. 21, 2009. Although his testimony about his drinking was not totally consistent with the testimony from his wife, Susan Sarin, regarding the same time period, Susan Sarin's Dep. 29:8–18, Dec. 9, 2009, a

reasonable jury could believe from all of the evidence that the defendant's acts of discrimination caused a detrimental effect to him.

The plaintiff argues that he has established that a reasonable person would also have been harmed by this discriminatory conduct by referring to hypothetical questions that were asked of witnesses during depositions. When asked whether the discrimination that the plaintiff alleges would interfere with an employee's ability to work, Popp, Miscavage, Warunek, and Canterino all agreed that it would. In light of the above analysis of the pervasiveness and regularity of the harassment in this case, the evidence is sufficient to support a finding that the work environment at Arby's was objectively hostile.

There is no real dispute in this case that there is a basis for respondeat superior liability. Liability exists "where the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293–94 (3d Cir. 1999) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1486 (3d Cir. 1990)). A reasonable jury could find that Popp, as owner and operator of Poojan, Inc., not only knew that Miscavage was harassing the plaintiff but also contributed to it personally. The defendant could not in this case defeat liability by claiming that respondeat superior does not apply.

**IV. Conclusion**

It is recommended, therefore, that the defendant's motion for summary judgment be granted on the wage-discrimination claim for failure of the plaintiff to exhaust his administrative remedies and on the Title VII disparate-treatment claim, and denied on the PHRA hostile-work-environment claim.

s/ William T. Prince

William T. Prince

United States Magistrate Judge

April 30, 2010